UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES A. GLEASON,

        Plaintiff,

   v.                                              Case No. 11-C-512

STEVEN J. PRESTO, LESLIE LEMIEUX,
and JACOB MEYER,

        Defendants.

**ORDER GRANTING SUMMARY JUDGMENT**

Plaintiff James Gleason brought this civil rights action under 42 U.S.C. § 1983 against three law enforcement officers who conducted a "high risk traffic stop" on the vehicle he was driving and then searched both him and his car. Plaintiff alleges the defendants lacked probable cause for the stop and the search, and that they used excessive force in the manner in which they conducted the stop. The Court has jurisdiction under 28 U.S.C. § 1331. Both sides have now moved for summary judgment. For the reasons that follow, Defendants' motion for summary judgment (ECF No. 24) will be granted and Plaintiff's motion for partial summary judgment (ECF No. 29) will be denied.

**I. Background**

On the afternoon of April 30, 2011, Officer Steven Presto of the City of New Holstein Police Department, and Deputies Jacob Meyer and Leslie Lemieux of the Calumet County Sheriff's Department performed a high risk traffic stop on Plaintiff James Gleason as he was driving to work. Plaintiff is a sergeant employed by the Wisconsin Department of Corrections. Officer Presto began

following Plaintiff about ten miles before he conducted the stop because he believed Plaintiff's older brother, Robert Gleason, was in the car and that Robert had recently flashed a gun at the children of a witness who was to testify in Robert's upcoming trial for sexual assault. The key question in the case is whether the actions of defendant law enforcement officers were reasonable within the meaning of the Fourth Amendment, as made applicable to the States through the Fourteenth Amendment. In order to answer that question, it is first necessary to describe the circumstances leading up to the stop.

The previous summer, Robert Gleason had been charged with repeated sexual assault of a 14-year-old child, and trial was scheduled to commence on May 4, 2011. Officer Presto was the investigating officer in the case. (ECF No. 25, Def.'s PFOF ¶ 4, 5.) While his case was pending, Robert was released from custody on bail. As a condition of his bail, Robert was prohibited from possessing a firearm. Officer Presto was present at the hearing at which that condition was imposed and knew of the firearm prohibition. Plaintiff was also in the courtroom at the time. (*Id.* ¶¶ 10, 11, 15.)

Officer Presto was aware that prior to the addition of the firearm prohibition to his bond, Robert Gleason was known to carry a gun when he traveled around the City of New Holstein. Indeed, the October 7, 2010 edition of the local newspaper carried an article in which Robert was quoted as saying that he "goes out into the world each day strapped with either a 9 mm, a .45, or a .357 handgun, 'depending on how I feel that day.'" A number of citizens who had seen him openly carrying a firearm had also called police with concerns about his behavior. In addition, there had been complaints that Robert had tried to intimidate the victim and a prosecution witness, and had attempted to contact the victim's family through third parties. (*Id.* ¶¶ 6-9.)

2

On the morning of April 30, 2011, Officer Presto took a witness statement and served a subpoena on Charles Kramp, Robert's neighbor, who was to appear as a witness at Robert's trial that was to take place a mere five days later. That afternoon, while Officer Presto was pulled over on the side of the road, Kramp pulled his vehicle alongside Officer Presto and told him that his two minor children, ages 8 and 12, who were in the car with him, had just witnessed Robert Gleason "flash" a handgun at the three of them while they drove by. Kramp reported that Robert Gleason had been standing next to a blue car at the time, but he believed that the blue car, with Robert Gleason in the passenger's seat, was now following them. (*Id*. ¶¶ 16-21.)

As Kramp was reporting the details of the incident to Officer Presto, a blue car came down the street towards them. Kramp stated to Officer Presto that the blue car was in fact the car that was following them, and that Robert Gleason was inside the vehicle. At this point, Officer Presto left Kramp and began to follow the blue vehicle. (*Id*. ¶¶ 23, 27.)

While following the car, Officer Presto contacted Kramp on his cell phone to confirm that Robert Gleason was in the car and that he had brandished a handgun at Kramp and his two children. (*Id.* ¶¶ 27.) Kramp confirmed this information and told Officer Presto that he was following the correct car. (*Id.*) Officer Presto stated he was not able to determine visually whether anyone was in the passenger seat while driving because of the height of the rear seat. (*Id*. ¶ 29.) Officer Presto notified dispatch that he was following a vehicle with a passenger believed to be carrying a firearm in violation of his bond and requested back-up. Shortly thereafter, Calumet County Sheriff Deputies Lemieux and Meyer responded to the call, along with another officer from the City of Kiel Police Department. Officer Presto initiated the stop. (*Id.* ¶ 36.)

Believing that the suspect in the passenger's seat was armed, Officer Presto and the other officers conducted a "high-risk stop." (*Id.* ¶ 37.) This entailed all three defendants drawing their weapons and pointing them at Plaintiff's vehicle while Officer Presto gave orders to Plaintiff through his car's public address system. (*Id.* ¶¶ 40-42.) Plaintiff was ordered to place his hands outside the window, drop the vehicle's keys, get out of the vehicle, step backwards towards the officers, and get on his knees. The officers kept their weapons drawn on Plaintiff until he complied with the officer's orders. Plaintiff was then handcuffed, patted down, and placed in the back of Officer Presto's squad car. At the time of his detention, Plaintiff was wearing his Wisconsin Department of Corrections uniform. (*Id.* ¶¶ 42-45.)

After Plaintiff was detained, Officer Presto continued to give commands over his public address system to the suspect he believed was in the passenger's seat of the vehicle. It turned out, however, that there was no one else inside the vehicle. (*Id.* ¶¶ 49-50.) Deputy Lemieux then handcuffed Plaintiff, conducted a pat down search of his person for weapons, and placed him in the New Holstein squad car. (*Id.* ¶ 44.) After Deputy Meyer and another officer from the Kiel Police Department looked through the vehicle's window and discovered there was no one else inside the car, Officer Presto and Deputy Meyer searched the vehicle, described as "a hatchback style car," for the handgun reportedly seen by Kramp's children. (*Id.* ¶ 51; Meyer Dep., ECF No. 29-6, at 24.) Plaintiff did not consent to a search of his vehicle, and no firearms were found as a result of the search. (Lemeiux Dep., ECF No. 29-5, at 40–41.) After the search of the vehicle, Officer Presto removed Plaintiff's wallet from his pocket and examined Plaintiff's driver's license for the purpose of identifying him. (Def.'s PFOF ¶ 54.) Plaintiff was thereafter released. (Lemeiux Dep. at 43.)

4

There is some evidence that Officer Presto had previous contact with Plaintiff. Officer Presto had arrested Plaintiff approximately fifteen years ago when he violated a no-contact order with his wife. Officer Presto stated that he could recognize Plaintiff's face, but could not remember his first name. In addition, Plaintiff had previously filed a lawsuit against the Calumet County Sheriff for refusing to consider him for an internship when he was pursuing his law enforcement education and training. (Def.'s PFOF ¶¶ 55, 57-59.)

**II. Summary Judgment Standard**

A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Material" means that the factual dispute must be outcome-determinative under law. *Contreras v. City of Chicago*, 199 F. 3d 1286, 1291 (7th Cir. 1997). A "genuine" issue must have specific and sufficient evidence that, were a jury to believe it, would support a verdict in the non-moving party's favor. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has the burden of showing there are no facts to support the non-moving party's claim. *Celotex*, 477 U.S. at 322. In determining whether to grant a motion for summary judgment, the court should consider the evidence presented in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. When the record, taken as a whole, could not lead a rational jury to find for the non-moving party, there is no genuine issue and therefore no reason to go to trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**III. Analysis**

**A. Unlawful Detention**

Plaintiff first claims he was unlawfully stopped and detained in violation of the Fourth Amendment. Normally, a law enforcement officer must have probable cause to believe an individual has committed a crime in order to seize and arrest him. *Henry v. United States*, 361 U.S. 98, 102 (1959). Probable cause, as the name implies, is about probabilities. *Brinegar v. United States*, 338 U.S. 160, 175 (1949). Probabilities are not technical matters; "they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved." *Id.* More than bare suspicion, probable cause is said to exist "where the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Id.* at 175-76 (internal quotations omitted). "The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." *Beauchamp v. City of Noblesville, Ind.,* 320 F.3d 733, 743 (7th Cir. 2003). However, "in crediting the complaint of a reasonably believable witness or putative victim, the police are under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth." *Id.*

Under *Terry v. Ohio*, police officers may conduct a brief, investigatory stop of a suspect if they have reasonable suspicion based on articulable facts that a crime is about to be or has been committed. 392 U.S. 1, 30 (1968). "Reasonable suspicion" must be based on some objective

6

manifestation that the suspect is involved in criminal activity. *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000). Although police may not detain a suspect based merely on a hunch, the likelihood of criminal activity need not rise to the level required for probable cause and falls well short of meeting a preponderance of the evidence standard. *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); *see also Gentry v. Sevier*, 597 F.3d 838, 839 (7th Cir. 2010) (although the term "reasonable suspicion" has been loosely defined, it has been decided that "reasonable suspicion" means "more than a hunch but less than probable cause and considerably less than preponderance of the evidence."). In evaluating the reasonableness of a stop, courts must examine the totality of the circumstances known to the officer at the time of the stop. *United States v. Jackson*, 300 F.3d 740, 745–46 (7th Cir. 2002).

From the undisputed facts before me, I conclude that the stop was reasonable. Officer Presto was given information from Kramp that a defendant about to stand trial on a serious charge at which Kramp was to testify as a witness for the prosecution had just flashed a gun at him and his two children, and that the defendant was following them in a blue car. Kramp then identified the car following them, as it drove by Officer Presto and Kramp, and stated that the defendant was still inside. Kramp repeated this information and confirmed his identification of the vehicle over the phone once Officer Presto began his pursuit of the vehicle. There can be no doubt that Presto actually believed Robert Gleason was in the car. Even after the officers had stopped the car and Plaintiff exited the vehicle, the officers continued to give commands over the squad car's public address system for the passenger of the vehicle to exit. Given the information conveyed by Kramp, the serious nature of the charges Robert Gleason was facing, his history carrying guns, the previous reports of witness intimidation, and his close relationship with his brother, Officer Presto was

7

justified in conducting a high-risk stop of Plaintiff's car. These facts taken together indicate Plaintiff's detention was on more than just a hunch. Based on the information he received from Kramp, Officer Presto had "reasonable suspicion" to conduct a brief investigatory stop. Indeed, under the undisputed facts before me, it is likely that the officers had probable cause to believe a crime had been committed and that evidence of that crime would be found in the vehicle Robert Gleason was driving.

In his argument to the contrary, Plaintiff relies on *Phelan v. Village of Lyons*, 531 F. 3d 484, (7th Cir. 2008), but his reliance is misplaced. In *Phelan*, there were definite, articulable facts that should have led the police officer to realize that the car he was following did not match the vehicle description. In the present case, there were no pertinent facts suggesting that the suspect was not in the vehicle Kramp identified. In fact, all the circumstances surrounding the stop would have led a reasonable person to believe that the suspect was indeed still inside the vehicle.

Plaintiff claims Officer Presto should have personally interviewed Kramp's children before pursuing his car. Plaintiff also contends that Officer Presto should have sought further clarification of some of the apparent inconsistencies in Kramp's version of the events. For example, at one point in their conversation Kramps said he did not know where Robert went after they passed him; yet he said he was a passenger in the car that was following them. But it would have taken additional time to interview Kramp's children individually or cross-examine Kramps in an effort to nail down precisely what he saw. Given the serious nature of the allegations, it would have been unreasonable to delay while a dangerous suspect who was riding in a car that had just driven past him continued on his way. *See United States v. Tilmon*, 19 F.3d 1221, 1225 (7th Cir. 1994) ("A court in its assessment should take care to consider whether the police are acting in a swiftly developing

8

situation, and in such cases the court should not indulge in unrealistic second-guessing.") (internal quotation omitted). The fact that Plaintiff can point to apparent inconsistencies does not create an issue of fact concerning whether Presto's actions were reasonable. Crime victims, especially when frightened, will not always give a perfect recitation of the events to a police officer moments after the incident. Such an imperfect recitation does not bear on the ultimate question here, which is whether Officer Presto's reliance on the information provided, in light of the totality of the circumstances, created a "reasonable suspicion" such that he could briefly detain Plaintiff without violating the Fourth Amendment.

Finally, Plaintiff continually refers to Kramp and/or his children as "confidential informants" and argues the officers were required to investigate the veracity of their claims before stopping the vehicle. But neither Kramp nor his children were confidential informants; Kramp was a citizen witness known to Officer Presto who reported a crime, and his children were with him in the car as Kramp related their observations to Officer Presto. When information comes from one who claims to have witnessed a crime or to have been the victim of a crime, that information carries with it indicia of reliability and is presumed to be reliable. *See United States v. Wilson*, 479 F. 2d 936 (7th Cir. 1973). Also, the Seventh Circuit held that veracity standards are not applicable to other, non-confidential sources of information. *See Edwards v. Cabrera*, 58 F.3d 290 (7th Cir. 1995). Accordingly, Plaintiff's argument that the officers had additional duties to investigate Kramp's claims fails. In sum, in light of all of the evidence available to the officers at the time of the stop, it cannot be said that the decision to stop Plaintiff's vehicle was unreasonable. Defendants are therefore entitled to summary judgment as to this claim.

9

**B. Excessive Force**

Plaintiff also claims that he was subjected to excessive force at the time of his detention because all four of the officers pointed their weapons at him when he was pulled over. (Compl. at 7.) A claim that law enforcement officers used excessive force during the course of an arrest, investigatory stop, or other "seizure" of a free citizen is analyzed under the Fourth Amendment and its "reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The reasonableness of the force used to detain a suspect requires a determination of whether an officer's actions are "objectively reasonable" in light of the facts and circumstances confronting them. *See Terry,* 392 U.S. at 21; *see also United States v. Scott*, 436 U.S. 128, 137–39 (1978). The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *See Terry,* 392 U.S. at 20–22. A determination of whether the amount of force was reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Plaintiff cites *McDonald v. Haskins*, 966 F.2d 292 (7th Cir. 1992), to support his contention that pointing a firearm at an individual may constitute excessive force. Plaintiff also cites *Jacobs v. Chicago*, 215 F.3d 758 (7th Cir. 2000). Neither case supports Plaintiff's claim that the officers used excessive force here. In *McDonald*, a police officer was alleged to have held a gun to head of nine-year-old boy and threatened to pull the trigger during course of search of boy's residence. There was no allegation that either the boy or anyone else posed a threat to the officer or public safety. The court held that this allegation was sufficient to withstand a motion to dismiss. And in

*Jacobs*, police officers were alleged to have broken down the door to the plaintiff's apartment and held a gun to his head for ten minutes, even after they determined that he was not the person they were looking for and despite the fact that he posed no threat to them. There, too, the court found the allegations sufficient to support a claim of excessive force.

Here, by contrast, it is undisputed that at the time the defendants pointed their guns at Plaintiff's car, they reasonably believed there was a passenger in Plaintiff's car who, while on bail for a serious crime, had committed a felony, namely, bail jumping in violation of Section 946.49 of the Wisconsin Statutes and possibly witness intimidation in violation of Section 940.43. More importantly, the officers reasonably believed that the passenger was armed with a handgun. Courts have long recognized that "[i]nvestigative detentions involving suspects in vehicles are fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047 (1983). And when there is reason to suspect that an occupant of the vehicle is armed, law enforcement officers are entitled to approach the vehicle with their own guns drawn. *United States v. Hensley*, 469 U.S. 221, 235 (1985) (police officers were "well within the permissible range in the context of suspects who are reported to be armed and dangerous" in approaching, with their guns drawn, a vehicle they had stopped) Allowing police to draw their weapons has been held to be reasonable when the "suspect is thought to be armed, or even when he is thought to be involved in criminal activity in which the use of weapons is commonplace." *United States v. Aurelio Lechuga*, 925 F.2d 1035, 1040 (7th Cir. 1991).

From the foregoing, it follows that the defendants acted reasonably in momentarily pointing their guns at Plaintiff during the stop of his vehicle. Furthermore, there is no evidence to suggest the officers actually used any force; by drawing their guns they used the threat of force, not actual

11

force to insure compliance with their directives. Given the circumstances, no reasonable finder of fact could conclude the officers' drawing of their guns constituted excessive force. Defendants are accordingly entitled to summary judgment on this ground as well.

**C. Search of Plaintiff and Car**

Plaintiff next claims that the defendants unlawfully searched him and his car after the stop even after they realized that Robert was not a passenger. But *Terry* also recognizes the authority of an officer conducting an investigatory stop to take reasonable steps to assure the safety of himself and others. Specifically, an officer may frisk a detained individual for weapons when the officer reasonably believes that the suspect may be armed and poses a danger to the officer or others nearby. 392 U.S. at 27, 30–31. And where the detention is of a person driving or occupying a car, police may conduct a protective "search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden." *Michigan v. Long*, 463 U.S. at 1049. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others is in danger." *Terry*, 392 U.S. at 27. That assessment is made based on the totality of the circumstances. *E.g.*, *United States v. Robinson*, 615 F.3d 804, 807–08 (7th Cir. 2010).

Given the information they had received from Kramp and the surrounding circumstances, the protective search of Plaintiff and his car was reasonable. Robert was seen near the car when Kramp passed him. Kramp informed Officer Presto that he believed Robert had then entered the car and the car was following him. Robert was prohibited from possessing a firearm, and if he had been riding in his brother's car, he would have seen Kramp talking to Officer Presto and would not

12

have wanted to be caught with the gun in his possession. It was thus reasonable to believe, based on all the evidence, that the gun Robert was observed holding was in the car even if Robert was no longer there. Indeed, based on the foregoing, it is arguable that there was probable cause to search the car, whether Officer Presto thought there was or not.

Plaintiff seems to assume that because he is a correctional officer and was not charged with a crime like his brother, it was unreasonable for the defendants to believe he was involved in a crime or posed a threat to them. But being a correctional officer does not place one above suspicion or immunize one from lawful searches and seizures. Plaintiff was the driver of the car in which his brother, who was on bail for sexual assault at the time, was reported to have been riding immediately after he flashed a gun at the children of a witness against him. The witness further reported that the car was following them. Moreover, Plaintiff was supportive of his brother, even attending the court proceedings when the firearm prohibition was imposed. To the extent Kramp's statement implicated Robert in a crime, it likewise implicated James as a potential aider and abetter of that crime. Given these circumstances, Officer Presto had more than sufficient evidence to conduct the kind of brief investigatory stop authorized by *Terry*. Placing Plaintiff in handcuffs, under the circumstances, would not have transformed the investigatory stop into an arrest. *See United States v. Perdue*, 8 F.3d 1455, (7th Cir. 1993) (noting "recent trend allowing police to use handcuffs or place suspects on the ground during a *Terry* stop").

Assuming the defendants had a reasonable suspicion to pat down Plaintiff in search of a gun, they likewise had reasonable suspicion to search the passenger compartment of the car. *Michigan v. Long*, 463 U.S. at 1049. While the scope of such a search may not extend to the trunk, it does extend to a hatchback or other compartment accessible from inside the vehicle. *See United States*

13

*v. Arnold*, 388 F.3d 237, 240 (7th Cir. 2004) (noting that "[o]ther circuits have held that a search under *Belton* encompasses cargo spaces of sports utility vehicles, hatchbacks, and station wagons"). Plaintiff's vehicle was a hatchback (Meyer dep., ECF No. 29-6, at 31), so the exception would seem fully applicable here.

It is true, as Plaintiff points out, that in *Arizona v. Gant* the Supreme Court narrowed the scope of the a search of a vehicle that is permitted incident to an arrest. 556 U.S. 332 (2009). *Gant* held that an arrest by itself does not justify a search of the automobile the person arrested was occupying if the arrestee has been removed from the automobile, taken into custody and no longer has access to the area. But *Gant* only applies to the kind of general search incident to an arrest that was the focus of the Court's attention in *New York v. Belton*, 453 U.S. 454 (1981). It has no application to a protective search based on a reasonable suspicion that the recent occupant of the vehicle may be armed. *See United States v. McCraney*, 674 F.3d 614, 620 (6th Cir. 2012) ("A search based on such reasonable suspicion is permissible even if the suspect is detained outside the vehicle because 'if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside.'") (quoting *Michigan v. Long*, 463 U.S. at 1052). In addition, the limitation recognized in *Gant* does not apply "when it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Gant*, 556 U.S. at 343 (internal quotation omitted). And of course, *Gant* does not apply when there is probable cause to believe the car contains evidence of a crime, regardless of whether the occupant is arrested or believed to be armed. *California v. Carney*, 471 U.S. 386, 391 (1985). Plaintiff suggests that even if the defendants had found a gun in his car, it would prove nothing since it was his car and he could legally carry a gun in his car. But a gun with Robert's fingerprints on it would have been evidence

14

that corroborated the information Kramp had conveyed earlier. It clearly would constitute evidence of a crime.

Finally, Plaintiff also objects to the fact that Officer Presto removed his wallet to check his identification without his consent. But because Officer Presto had a reasonable basis for briefly detaining Plaintiff, it was not unlawful for him to check Plaintiff's wallet for identification. *See United States v. Brown*, 366 F.3d 456, 461 (7th Cir.2004) ("[A]n officer may check an individual's identification in his wallet during a *Terry* stop."); *Jewett v. Anders*, 521 F.3d 818, 827 (7th Cir. 2008) (same). Officer Presto did not recall Plaintiff's first name. The fact that Officer Presto may have recognized Plaintiff as someone he had seen or perhaps even arrested before does not eliminate the need to confirm his identity. For all of these reasons, I conclude on the undisputed facts of the case that the defendants' actions were lawful.

**D. Qualified Immunity**

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine balances two important interests – the need to hold government officials who abuse their offices accountable, and the need to minimize the risk that the "fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The protection afforded by the doctrine is quite broad. The Supreme Court has explained, "the qualified immunity defense . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "Thus, so long as

15

'officers of reasonable competence could disagree on this issue, immunity should be recognized.'" *Wagner v. Washington County*, 493 F.3d 833, 837 (7th Cir. 2007) (quoting *Malley*, 475 U.S. at 341).

For the reasons set forth above, I have concluded that the defendants' actions were lawful and not in violation of Plaintiff's constitutional rights. But even if my conclusion is in error, the defendants are nevertheless entitled to summary judgment under the doctrine of qualified immunity. Confronted with a report of a serious violation of the law involving a firearm by a person already charged with a serious offense, Officer Presto acted reasonably in attempting to verify the information he was provided and at the same time neutralize the risk of danger. Deputies Lemieux and Meyer provided back-up assistance, relying entirely on the information they were provided by a fellow law enforcement officer. There is no evidence of plain incompetence or intent to knowingly violate the law. The defendants' actions reveal a genuine concern that Robert Gleason was a passenger in Plaintiff's car, that Robert was armed and that he had flashed a gun at Kramp and his children. The report Kramp made to Officer Presto was apparently in error, but it was not unreasonable for Officer Presto to act on it at the time, especially given the surrounding circumstances. For this reason, too, the defendants' motion will be granted.

**IV. Conclusion**

In sum, Plaintiff's claims that the officers subjected him to unlawful detention, excessive force, and unlawful search fail as a matter of law on the undisputed evidence before me. Alternatively, the defendants are shielded from liability under the doctrine of qualified immunity. For all of the reasons stated above, the Plaintiff's motion for partial summary judgment (ECF No.

16

29) is denied and Defendants' motion for summary judgment on all claims (ECF No. 24) is granted. The clerk is directed to enter judgment in favor of Defendants and against the Plaintiff.

Dated this  9th  day of August, 2012.

                                            s/ William C. Griesbach
                                            William C. Griesbach
                                            United States District Judge

17

Case 1:11-cv-00512-WCG   Filed 08/10/12   Page 17 of 17   Document 34